UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

IN RE:

DANIIL RAPOPORT and                          Case No. 11-45373-wsd
MARIA RAPOPORT,                              Chapter 13

       Debtors.                              Hon. Walter Shapero
_____/

DAVID FINDLING,
*State Court Appointed Receiver*,

       Plaintiff,

v.                                           Adv. Pro. No. 11-06933

DANIIL RAPOPORT and
MARIA RAPOPORT,

       Defendants.
_____/

## OPINION REGARDING PLAINTIFF'S CLAIM TO ESTABLISH A NON-DISCHARGEABLE § 523(a)(2)(A) DEBT, DEFENDANTS' OBJECTIONS TO PLAINTIFF'S PROOF OF CLAIM, PLAINTIFF'S OBJECTIONS TO DEFENDANTS' PROPOSED CHAPTER 13 PLAN, AND SANCTIONS

### INTRODUCTION

Defendants Daniil and Maria Rapoport filed this case as a joint chapter 7 on March 1, 2011, which was converted to chapter 13 on July 7, 2011 by stipulation with the U.S. Trustee. Plaintiff, David Finding, is a Receiver appointed by the Oakland County Circuit Court to seize the assets of Vladimir Nozhnik in order to satisfy a $120,000 divorce settlement awarded to his ex-wife Esfir Nozhnik in 2008. To avoid this judgment, Vladimir hid over $100,000 ("the Nozhnik funds") in bank accounts in his second wife's name, Luidmila Storozhenko, who later appropriated the money in August 2009 after their marriage ended. Luidmila is the mother of Maria Rapoport and resides with both Defendants. Plaintiff now seeks to recover the judgment

1

from Defendants and alleges that they engineered a scheme with Luidmila to defraud Vladimir out of the Nozhnik funds. In his capacity as Receiver, Plaintiff filed a proof of claim for $231,144.73 in Defendants' case and an adversary proceeding claiming that this alleged debt is non-dischargeable on the basis of actual fraud under 11 U.S.C. § 523(a)(2)(A). For the reasons set forth, this Court finds that Plaintiff has failed to establish the existence of any claim, non-dischargeable or otherwise, and his claims against Defendants' bankruptcy estate are denied.

## BACKGROUND FACTS

### *Luidmila and Vladimir Nozhnik*

Pursuant to a 2008 judgment of divorce, Vladimir Nozhnik was ordered to pay $120,000 in non-modifiable spousal support to Esfir Nozhnik over the course of five years. (Pl.'s Ex. E at 2). Shortly thereafter, Vladimir was remarried to Luidmila Storozhenko. To shelter money from the Receiver, Vladimir hid over $100,000 in online bank accounts opened in Luidmila's name. (Trial Test. vol. 3, 11:41, Oct. 24, 2012, ECF No. 98). Luidmila was aware that Vladimir was hiding money, but since she is not completely fluent in English and apparently according to her has limited computer skills, Vladimir maintained exclusive control of these accounts through passwords apparently unknown to Luidmila.

Luidmila has lived with Daniil and Maria Rapoport since emigrating from the U.S.S.R. Vladimir also resided in that home during his marriage to Luidmila. Although the arrangement was congenial at first, Vladimir became abusive towards Luidmila and he was thrown out of the Rapoport home on August 6, 2009. Vladimir left without his laptop computer, which contained the passwords to the hidden bank accounts holding the Nozhnik funds. On August 18, 2009, Luidmila filed for divorce ("the 2009 divorce"). That same day, the Oakland County Circuit Court entered a Mutual Property Injunction ("the Injunction") that prevented both parties from disposing any assets except as needed in the ordinary course of living. (Pl.'s Ex. F at 1).

2

Approximately a week later, Vladimir retrieved his computer and discovered that he had been locked out of the accounts holding the Nozhnik funds. (Trial Test. vol. 3, 1:53).

At a status conference in the 2009 divorce case, Luidmila disclosed to the state court that she had spent an estimated $50,000 of the Nozhnik funds in violation of the August 18th Injunction. (*See* Pl.'s Ex. G at 20). To assert his interest in this money, Vladimir admitted that it was actually his, but that he hid the money in Luidmila's name to frustrate the Receiver's collection efforts. *Id.* The state court judge ordered that these accounts be frozen. *Id.* at 25. A subsequent evidentiary hearing revealed that Luidmila had actually spent over $100,000 in the weeks following the entry of the Injunction. (Pl.'s Ex. A at 6). This money was spent on consumer goods, furniture, home renovations, and a family vacation for the Rapoports. Defendants deny any involvement in assisting Luidmila appropriate or spend the Nozhnik funds.

Plaintiff filed a motion in the state court for Luidmila to show cause why she not be held in civil contempt for violating the Injunction. (Pl.'s Ex. H). In addition, Plaintiff filed a third party complaint in that same case against the Defendants seeking to hold them liable as recipients of a fraudulent transfer from Luidmila and recover the Nozhnik funds that she allegedly spent for their benefit. Before the state court could adjudicate that third party complaint against Defendants, they filed this present case which effectuated the automatic stay and halted that litigation. The state court did however adjudicate the motion to show cause against Luidmila, holding her in civil contempt for violating the Injunction. As a result, the state court ordered her to pay compensatory damages to Plaintiff in the amount of $106,144.73. The day after judgment was entered, Luidmila filed for chapter 7 bankruptcy in this court. *In re Storozhenko*, 487 B.R. 457 (Bankr. E.D. Mich. 2012) (J. Tucker). The Bankruptcy Court ultimately dismissed her case under § 727(a)(3) and (a)(4) for failing to maintain adequate records and for making a false oath. *Id.* at 468.

3

*Daniil and Maria Rapoport*

Leading up to their bankruptcy, Daniil was employed as an engineer and Maria was working as a nurse and they were earning a comfortable joint annual income, as high as $174,000 in 2010. (*See* Pl.'s Ex. Q). By the end of 2010, Maria quit her job to pursue a master's degree enabling her to become a licensed nurse anesthetist. Defendants expected that Maria's lost annual salary would be offset by generous living expense loans in addition to student aid for tuition. Apparently due to changes in the lending industry, Maria only received loans to cover her tuition. This reduction in income caused Defendants to default on their mortgages on the Novi rental property and their West Bloomfield residence. Once workout negotiations with the banks failed, Defendants filed this case essentially to avoid foreclosure.

Defendants initially retained attorney Martin Bordoley to file a chapter 7 case. The § 341 meeting of the creditors was held on April 6, 2011 ("the first § 341 meeting"). During that meeting, Defendants disclosed some additional assets that were not initially listed in their petition. Based on these disclosures and incorrect calculations in Defendants' means test analysis, the chapter 7 trustee filed a report on April 15, 2011 alleging that Defendants' case was presumed abusive under § 707(b). (Statement of Presumed Abuse, Apr. 15, 2011, ECF No. 21). Consequently, the U.S. Trustee filed a Motion to Dismiss on June 3, 2011. (Trustee's Mot. to Dismiss, June 3, 2011, ECF No. 41). By stipulation of Defendants and the Trustee, the Court entered an order converting this case to chapter 13, effective July 7, 2011. (Order Resolving Mot. to Dismiss, June 21, 2011, ECF No. 61).

On June 17, 2011, Defendants replaced Bordoley with Aaron Scheinfield as their counsel. Defendants filed their initial chapter 13 plan on July 7, 2011 and the chapter 13 meeting of the creditors was held on August 23, 2011 ("the second § 341 meeting"). The U.S. Trustee objected to confirmation of this plan on several bases and moved this Court to dismiss the case.

(Trustee's Objections, Sept. 2, 2011, ECF No. 111). The Defendants have since filed four amended plans[1] addressing the Trustee's concerns and confirmation of the latest plan is still pending.

### Procedural Posture

Plaintiff brings this claim in his capacity as Receiver pursuant to two state court orders granting him the authority to sue on Vladimir's behalf.[2] He filed a proof of claim on November 21, 2011, for $231,144.73 which was later amended to assert priority status as a domestic support obligation. (Claim 12-2, Oct. 3, 2012). On November 23, 2011, Plaintiff filed an adversary proceeding seeking to hold Defendants liable for a non-dischargeable debt under § 523(a)(2)(A) based on a theory that they committed actual fraud by conspiring with Luidmila to steal the Nozhnik funds. (Pl.'s Compl. ¶¶ 10–12, Nov. 23, 2011, ECF No. 1). Plaintiff has also moved this Court to deny confirmation of Defendants' chapter 13 plan for bad faith pursuant to § 1325(a)(3) and (7). (Pl.'s Objections to Confirmation 5, Aug. 16, 2013, ECF No. 369). The Court held a consolidated trial to resolve all three contested issues.

Two other ancillary issues arose concurrently with this trial. First, Plaintiff filed a Motion to Disgorge the Attorney's Fees of Martin Bordoley in order to recover his $2,000 fee for the benefit of Defendants' estate. (Mot. to Disgorge, Sept. 15, 2011, ECF No. 126). An evidentiary hearing on this motion was held immediately prior to trial. Second, on the morning of the second day of trial the Court was made aware of an improper communication between Daniil and the Court's translator. At that time, the Court struck all of Luidmila's previously translated

---

[1] *See* Docket Nos. 62, 138, 162, 328, 361.

[2] Both orders appointing Plaintiff as Receiver contain nearly identical language which grant him the authority to:

> Initiate, defend, compromise, adjust, intervene in, dispose of, or become a party to any actions or proceedings in state, federal or foreign court necessary to preserve or increase the assets of [Vladimir Nozhnik] [Luidmila Storozhenko and/or Vladimir Nozhnik] or to carry out his or her duties pursuant to this Order; . . . .

(Am. Order Appointing Receiving Ex. D, at 6); (Am. Order Appointing Receiving Ex. C, at 6).

testimony which extended trial an additional day so that Plaintiff could recall her as a witness. This prompted Plaintiff to file a Motion for Sanctions against Defendants. After trial, the Court took all above matters under advisement. Plaintiff and Defendants filed post-trial briefs and the Court held closing arguments. The following are the Court's findings of facts and conclusions of law.

## ISSUES PRESENTED

I. Whether or not Plaintiff has properly filed a proof of claim;

II. Whether Plaintiff has established the existence of an underlying debt and if so, whether this debt is excepted from discharge under § 523(a)(2)(A);

III. Whether the Defendants' bad faith warrants denial of their proposed chapter 13 plan;

IV. Whether or not the attorney's fees paid to Martin Bordoley should be disgorged on the basis of his non-compliance with 11 U.S.C. §§ 526–528;

V. Whether the Court should reconsider its decision regarding Daniil's improper communication with the court translator.

## STATEMENT OF JURISDICTION

The disallowance of Plaintiff's proof of claim, dischargeability of an alleged debt, and objections to plan confirmation are all core proceedings. 28 U.S.C. § 157(b)(2)(B), (I), (J). The Court has jurisdiction over these issues as well as attorney sanctions pursuant to 28 U.S.C. §§ 1334(b), 157(a), 157(b), and E.D. Mich. LR 83.50(a).

## DISCUSSION

### I. Defendants' Objections to Plaintiff's Amended Proof of Claim

Eleven months after filing his initial proof of claim, Plaintiff filed an amendment in order to assert that his $231,144.73 claim should receive priority status as a domestic support

6

obligation. (Claim 12-2, Oct. 3, 2012). Defendants have objected to this amended proof of claim on several grounds: (1) that it is asserting an untimely, new claim that should not relate back to the original proof of claim; (2) that Plaintiff has not attached sufficient documentation pursuant to Bankruptcy Rule 3001(c); (3) that the claim fails to meet various pleading standards; and (4) that Plaintiff failed to itemize expenses pursuant to Rule 3001(c)(2)(A). These objections will be considered in turn.

## A. Changing the Nature of the Claim

With respect to amending a proof of claim, this Court has held that "the general rule is that amendments intended to correct defects or mistakes are liberally allowed." *In re Dow Corning Corp.*, 250 B.R. 298, 319 (Bankr. E.D. Mich. 2000) (citing *In re Meade Tool & Die Co.*, 164 F.2d 228, 231 (6th Cir. 1947)). However, to prevent creditors from disguising an untimely new claim as an amendment to an existing claim, courts weigh the following to determine if the amendment should be allowed: (1) whether the amendment states a brand new claim and (2) whether equitable factors favor permitting the amendment. *In re Channakhon*, 465 B.R. 132, 140 (Bankr. S.D. Ohio 2012); *In re Parsons*, 135 B.R. 283, 284 (Bankr. S.D. Ohio 1991).

Borrowing language from F.R.C.P 15(c), courts have held that an amendment is not asserting a new claim if it "arose out of the conduct, transaction, or occurrence set out—or attempted to set out—in the original claim." *In re Channakhon*, 465 B.R. at 141 (quoting Fed. R. Civ. P. 15(c)); *see also In re Spurling*, 391 B.R. 783, 788 (Bankr. E.D. Tenn. 2008). Plaintiff's amended proof of claim does exactly that; it alleges that a debt is owed based on the same conduct—Defendants' actual fraud against Vladimir—as alleged in the original proof of claim. Merely changing this debt from non-priority to priority status does not constitute the filing of a new claim. *In re Ashland Steel Co.*, 168 F. 679, 680 (6th Cir. 1909) ("[I]t was within the power of the court to allow the claims priority, and give them the preference to which by law they were

entitled, notwithstanding no definite claim of the kind had been made during the year.").[3] The amendment asserts a claim arising out of the same conduct as the original and is not a new claim.

Secondly, the Court must consider the equitable factors including "[u]ndue delay in filing, lack of notice to the opposing party, bad faith by the [filing] party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment . . . ." *In re Channakhon*, 465 B.R. at 143 (brackets original) (citing *Moross Ltd. P'ship v. Fleckenstein Capital, Inc.*, 46 F.3d 508, 518–19 (6th Cir. 2006)). This is the first and only amendment filed by Plaintiff, thus there are no repeated failures to cure prior deficiencies. Moreover, Defendants clearly had sufficient notice of this claim as the underlying allegations have been litigated extensively throughout this case. Defendants' argument that the priority status would have changed their approach to discovery must be discarded. The question of whether or not this alleged claim qualifies as a domestic support obligation hinges upon an interpretation of law, and there is no factual dispute regarding the familial relations of the parties in this case such that additional discovery would be necessary.

The Court also does not find that Plaintiff acted in bad faith or created an undue delay. Although the amendment was filed eleven months after the original, the theory of the claim's priority status arose out of testimony at trial. The merits of Plaintiff's claim rest upon the determination of whether § 523(a)(2)(A) actual fraud was committed. The late assertion that this supposed obligation should receive priority status has not created an advantage for Plaintiff nor has it disadvantaged Defendants in litigating this core issue. The level of prejudice required to deny a proof of claim amendment is *undue* prejudice which "involves an irrevocable change in position or some other detrimental reliance on the status quo." *In re Outdoor Sports*

---

[3] *See also In re Meade Tool & Die Co.*, 164 F.2d 228, 231 (6th Cir. 1947). The Court recognizes that there is precedent outside this Circuit holding that amending an unsecured claim to assert priority status does set forth a new claim, but this Court is bound to follow the Sixth Circuit. *See In re Walls & All, Inc.*, 127 B.R. 115, 118 (W.D. Pa. 1991); *see also Highlands Ins. Co. v. Alliance Operating Corp.* (*In re Alliance Operating Corp.*), 60 F. 3d. 1174, 1175 (5th Cir. 1995).

*Headquarters, Inc.*, 161 B.R. 414, 422 (Bankr. S.D. Ohio 1993) (internal citations and quotations omitted). The Court finds that Defendants have failed to demonstrate they will suffer any prejudice, much less undue prejudice, by allowing this amendment. Therefore, Defendants' objection to Plaintiff's amended proof of claim on this basis is overruled.

**B.  Whether the Claim is Based on a Writing According to Bankruptcy Rule 3001(c)**

Defendants claim that Plaintiff's amended proof of claim is deficient because it failed to attach the original or duplicate writing it is based upon in accordance with Fed. R. Bankr. P. 3001(c). (Defs.' Objection to Am. Claim 7, Oct. 12, 2012, ECF No. 282). This rule provides that "when a claim . . . is based on a writing, the original or a duplicate shall be filed with the proof of claim." Fed. R. Bankr. P. 3001(c). The contrapositive indicates that if a claim is not based on a writing, no such writing need to be attached. The Ninth Circuit supported this reading of the statute in the context of a tax liability, explaining that "Rule 3001(c) is invoked where the obligation itself, and not its consequent enforcement, is based upon a writing. Simply put, no writing is required to create tax liability, and Rule 3001(c) does not apply to claims for such debt." *In re L.A. Int'l Airport Hotel Assocs.*, 106 F.3d 1479, 1480 (9th Cir. 1997).

Common examples of obligations that are based upon a writing include credit card debts or mortgages.[4] Conversely, the alleged debt in the present matter arises out of a common law cause of action. Much like the statutory tax liability in *L.A. Int'l Airport* the obligation is created by operation of law—not a written obligation. *Id.*; *see also In re Lampe*, 665 F.3d 506, 514 (3d Cir. 2011) (claim based on state law breach of fiduciary action was not based on a writing). Plaintiff's theory of liability does not arise out of a writing and thus Rule 3001(c) is inapplicable. Defendants' objection on this basis is overruled.

---

[4] *See, e.g.*, *In re Hughes*, 313 B.R. 205, 210 (Bankr. E.D. Mich. 2004) (credit card debt is based on a writing); *see e.g.*, *In re Wells*, 407 B.R. 873, 883 (Bankr. N.D. Ohio 2009) (mortgage is based on a writing); *but see In re Shaver*, 247 B.R. 436, 439 (Bankr. E.D. Tenn. 1999) (holding that an IRS obligation is statutory and thus not based on a writing).

9

## C. The Claim's Adherence to Pleading Standards

Defendants further object to the amended proof of claim arguing that it fails to state a claim upon which relief can be granted under F.R.C.P. § 12(b)(6) and fails to plead fraud with specificity. This objection is in part based on Bankruptcy Rule 7012(b) which applies F.R.C.P. 12(b)(6) to adversary proceedings generally, but other than this tangential connection Defendants provide no support for applying federal pleading standards to the proof of claim context. (*See* Defs.' Objection 8–9, ECF No. 282). More troubling is the fact that these issues have been ruled upon by this Court four months prior to when this objection was filed. (Hr'g on Def's Mot. for Summary J., 9:49, Jun. 14, 2012, ECF No. 67). At the hearing for Defendants' Motion for Summary Judgment, Defendants' counsel admitted that his motion at issue was actually "based on a failure to state a claim upon which relief can be granted and failure to plead fraud with particularity." *Id.* After oral arguments, the Court denied Defendants' motion based upon these standards (not a summary judgment standard) and held that Plaintiff had stated a valid cause of action. *Id.* at 10:06. Defendants' improper renewal of this objection is again overruled.

## D. Itemized Statement of Interest, Fees, Expenses, and Charges

Defendants also object to Plaintiff's proof of claim based on Rule 3001(c)(2)(A), which states that "[i]f, in addition to its principal amount, a claim includes interest, fees, expenses, or other charges incurred before the petition was filed, an itemized statement of the interest, fees, expenses, or charges shall be filed with the proof of claim." Fed. R. Bankr. P. 3001(c)(2)(A). Plaintiff does not dispute that the claimed amount includes applicable fees, interest, and expenses. (Pl.'s Resp. to Defs.' Objections 5, Nov. 16, 2012, ECF No. 291). Instead, he argues that because "[t]he amount of the claim to be awarded has yet to be determined" and because these costs "continue to grow" itemization under Rule 3001(c) is inappropriate. *Id.*

However, Plaintiff's originally filed proof of claim and the amended claim filed eleven months later both sought identical amounts of $231,144.73. There is no apparent basis for or itemization of this figure in either filed document. The state court judgment against Luidmila is $106,144.73, the state court third party complaint filed against Defendants seeks $150,000, and the adversary complaint currently alleges a debt non-dischargeable in an amount not less than $100,000. Either the $231,144.73 claim is arbitrary or Plaintiff could have calculated and itemized this amount, but neglected to provide this information to Defendants. In either case, this runs afoul Rule 3001(c)(2)(A)'s purpose of facilitating transparency in the proof of claims process. *See In re Jimenez*, 487 B.R. 543, 548 (Bankr. D. Colo. 2013) (stating that this rule exists so that "debtors have complete information with respect to fees and other charges included in a . . . claim.").

At trial, the Court admitted Plaintiff's itemization of additional fees and costs as Exhibit DD, but held that its admissibility would not prejudice Defendants' objections to Plaintiff's proof of claim. (Trial Test. vol. 3, 4:05). Plaintiff contends that admitting this document as an exhibit at trial is sufficient to meet the itemization requirement of Rule 3001(c)(2)(A). (*See* Pl.'s Reply 9, Mar. 11, 2013, ECF No. 116). However, the language of Rule 3001(c)(2)(A) is clear that the itemization "shall be filed *with* the proof of claim." Fed. R. Bankr. P. 3001(c)(2)(A) (emphasis added). This can only mean that two are filed concurrently. It would be in contravention of the purpose and clear language of Rule 3001(c)(2)(A) to allow Plaintiff to withhold the required itemization for this claim until trial has commenced eleven months later. Thus, exhibit DD will not apply retroactively and Defendants' objection on this basis is sustained.

**E. Result of Non-compliance with Rule 3001(c)(2)(A)**

Rule 3001(f) states that "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the amount." Fed. R.

Bankr. P. 3001(f). Thus, non-compliance with Rule 3001 does not disallow the claim outright, but merely negates the evidentiary presumption of validity. *In re Wingerter*, 594 F.3d 931, 941 (6th Cir. 2010); *In re Stow*, 12-15398, 2013 WL 3199825 (Bankr. E.D. Tenn. June 24, 2013). Without this evidentiary presumption, the burden is on Plaintiff to go forward with evidence to prove his claim. *In re Stow*, 2013 WL 3199825 at *2. Since Plaintiff also bears the burden to prove the underlying debt for his adversary claim, the Court's resolution of that issue will be duly dispositive to the proof of claim issue as well.

## II.   Defendants' Liability for a Non-Dischargeable § 523(a)(2)(A) Actual Fraud Debt

Plaintiff alleges that Defendants acted in concert with Luidmila to liquidate the accounts holding the Nozhnik funds. Specifically, he claims that they committed actual fraud "(1) by assisting Liudmila in the conversion of money; (2) by accepting goods, services and other benefits that were paid out of the money that was converted; and (3) by 'closing their eyes' to the fraud that was being committed right in front of them." (Pl.'s Findings of Fact 36, Jan. 16, 2013, ECF No. 112). Debts arising out of a debtor's actual fraud are excepted from discharge by § 523(a)(2)(A), which states:

> **(a)** A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt
> \*       \*       \*
> **(2)** for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
> **(A)** false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A) (2012). The disjunctive nature of the statute permits three separate theories of recovery; however, Plaintiff has only asserted that Defendants' actions gave rise to a debt for actual fraud. *In re Brown*, 442 B.R. 585, 600 (Bankr. E.D. Mich. 2011).

## A. The Two-Step Framework of § 523(a)(2)(A)

In order to except a debt from discharge, Plaintiff must first prove the existence of a debt. *In re Anton*, 08-64144, 2013 WL 1747907, at *3 (Bankr. E.D. Mich. Apr. 12, 2013). Proving a debt is non-dischargeable is "a two-step process: first, the establishment of the debt itself; and second, a determination as to the nature—dischargeable or nondischargeable—of that debt." *In re Valle*, 469 B.R. 35, 43 (Bankr. D. Idaho 2012). This Court has previously stated:

> The statutory scheme under § 523 is an inquiry, given the existence of the debt in the first place, as to whether or not that debt can be found nondischargeable. If there is no debt, the inquiry is at an end. In most cases, the existence of the required debt is not an issue and is more or less a given.

*In re Anton*, 2013 WL 1747907 at *2. However, because there is no judgment against Defendants or any determination of liability, the existence of a debt in this case is an issue. Although Plaintiff's adversary complaint alludes to conversion, conspiracy, fraudulent transfer, and fraud, his case focused entirely on proving the elements of § 523(a)(2)(A) actual fraud as if it were a cause of action instead of merely a characterization of debt. (Pl.'s Compl. ¶¶ 82–86). Actual fraud within § 523(a)(2)(A) only describes the nature of the debt; it is not a cause of action by itself. *See Banks v. Gill Distribution Centers, Inc.*, 263 F.3d 862, 869 (9th Cir. 2001) (describing how the claim is first liquidated based upon a state law cause of action and then § 523(a)(2)(A) applies to determine if that debt meets the standards required to deem it non-dischargeable actual fraud, regardless of how its characterized under state law). Plaintiff thus has essentially conflated the two steps of this process.

In *In re Anton* this Court recently dealt with a similar procedural problem. *In re Anton*, 2013 WL 1747907 at *2. In that case, the plaintiff similarly sought to use the elements of § 523(a)(2) and (a)(4) as the cause of action. *Id.* at *3 ("[T]he parties did not initially or separately deal with that question in any material way, except inferentially to the extent the elements of nondischargeability overlap those determining the existence of a debt in the first place.").

Ultimately, this Court concluded in that case that "the existence of the required 'debt' is questionable. However, the Court has decided to also deal with the nondischargeability issue because the proceeding has been presented to the Court in that posture." *Id*. Given that Plaintiff's proof of claim is predicated solely on actual fraud and the facts of this case were litigated as they relate to the elements of actual fraud, the Court will for the moment presume the existence of a debt in order to resolve the § 523(a)(2)(A) claim and revisit the issue of underlying debt or liability later.

**B. Actual Fraud Under § 523(a)(2)(A)**

This Court has followed the position of the Bankruptcy Appellate Panel of the Sixth Circuit holding that "[w]hen a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code." *In re Sterling*, 479 B.R. 444, 449 (Bankr. E.D. Mich. 2012) (quoting *Mellon Bank, N.A. v. Vitanovich* (*In re Vitanovich*), 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001)). Thus for a debt to be non-dischargeable as actual fraud, Plaintiff must prove the following elements by a preponderance of the evidence: "(1) a course of conduct intended to deceive; (2) justifiable reliance; and (3) proximate causation." *In re Sterling*, 479 B.R. 444, 449 (Bankr. E.D. Mich. 2012) (quoting *In re Vitanovich*, 259 B.R. at 877); *see Grogan v. Garner*, 498 U.S. 279, 291 (1991); *see In re Brown*, 442 B.R. 585, 600 (Bankr. E.D. Mich. 2011).[5] The Court has weighed the following evidence, assessed the credibility of the witnesses, and finds that Plaintiff has failed to meet his burden to prove that Defendants committed acts

---

[5] Defendants argue that Plaintiff cannot meet a five part test set forth in *Rembert v. AT & T Universal Card Servs., Inc.* (*In re Rembert*), 141 F.3d 277 (6th Cir. 1998). However, this Court has repeatedly followed *In re Vitanovich*, holding that the *Rembert* five-part test applied only to a theory of fraudulent misrepresentation and not to actual fraud. *In re Jagiello*, 11-67954, 2013 WL 4068166 (Bankr. E.D. Mich. Aug. 8, 2013); *see In re Kalinowski*, 11-49990, 2012 WL 4736798 (Bankr. E.D. Mich. Oct. 2, 2012); *see In re Sterling*, 479 B.R. 444, 449 (Bankr. E.D. Mich. 2012). Plaintiff has not alleged fraudulent misrepresentation and thus *Rembert* is inapplicable.

giving rise to a debt that can be characterized as or concluded to constitute § 523(a)(2)(A) actual fraud.

*(1) A Course of Conduct Intending to Deceive*

The first prong of the test requires Plaintiff to demonstrate that Defendants engaged in some intentional wrongful conduct to defraud Vladimir (and thus Plaintiff). *In re Sterling*, 479 B.R. at 449; *see In re Perry*, 448 B.R. 219, 225 (Bankr. N.D. Ohio 2011). The act and the intent must have occurred concurrently. *In re Lett*, 238 B.R. 167, 183 (Bankr. W.D. Mo. 1999) *subsequently aff'd*, 1 F. App'x 599 (8th Cir. 2001). "Fraudulent intent may be inferred by examining the Debtor's conduct to determine if he presented the Plaintiff with a picture of deceptive conduct, indicating an intent to deceive." *In re Brown*, 442 B.R. 585, 601 (Bankr. E.D. Mich. 2011) (internal citations omitted). Ultimately, the evidence does not support a finding that meets that standard.

(i)   Evidence Negating the Element of Intent

First, it is clear from Vladimir's testimony that he was highly protective and paranoid about his money. At trial, he admitted to opening bank accounts in Luidmila's name solely to hide money from the Receiver. Vladimir testified that he did not talk to Defendants about his money, which they both corroborated through their own testimony. The Court is persuaded that when Luidmila and Vladimir lived together in the Rapoport home, the Defendants did not pry into their private financial affairs. Moreover, it would not have been in Vladimir's best interest to be candid about the fact that he was hiding money illegally from the court appointed Receiver. Defendants' lack of knowledge of the Nozhnik funds tends to contradict Plaintiff's theory that they concocted a plan to remove Vladimir from their home, find his passwords, and access the accounts.

15

Second, the Court finds Luidmila lacking in credibility. Any questioning even remotely related to Vladimir's money, her illegitimate purchases, her ability to conduct online banking, or her relationship with Defendants, was met with nonresponsive answers. While the Court is aware of Luidmila's 2008 car accident and claimed related memory issues, she relied much too heavily and inappropriately on such as excuses for her conduct. Her lapse in memory conveniently only impacted her ability to recall the events and circumstances surrounding the dissipation of Vladimir's money; her memory before and after those events was seemingly unaffected. (*See* Trial Test. vol. 2, 3:13–16, Oct. 5, 2012). Furthermore, Luidmila was found in civil contempt in her state court divorce action and intentionally lied to this Bankruptcy Court in her bankruptcy proceeding. *See In re Storozhenko*, 487 B.R. 457, 468; (*see* Pl.'s Ex. A at 9).

Luidmila testified that she believed all of Vladimir's money also belonged to her. (Trial Test. vol. 6, 3:30, Nov. 28, 2012, ECF No. 106). However, she knew Vladimir was using the accounts to hide money from someone else. (Pl.'s Ex. A at 3); (*see also* Trial Test. vol. 3, 11:41). Further, she testified that she received an unspecified sum of money from Vladimir in the divorce, despite the fact that no settlement had yet been reached. (Trial Test. vol. 2, 4:26–27). When questioned about the civil contempt judgment, Luidmila continued to protest her innocence claiming that she didn't take money from anyone. *Id.* at 4:20. The Court can surmise that rather than being truthful, Luidmila used this trial as yet another forum to avoid responsibility for her own actions. This dishonesty, especially in contrast to Defendants' more credible performance works against her credibility.

Third, the way in which the money was spent tends to implicate Luidmila alone. The online accounts with Everbank and Venture Bank, two of the accounts holding the Nozhnik funds, show several large attempted transfers to Vladimir Nozhnik and Harleysville National Bank, totaling $28,466.96 and $51,873.00, respectively, occurring only days before Vladimir

was kicked out of Defendants' home. (Pl.'s Ex. H at 16–20, 26–27). The bank records indicate that these transfers were quickly reversed once Luidmila attested to the banks that these were unauthorized transactions. *Id.* at 16, 26–27. After the bank refunded the money, Vladimir was locked out the accounts and Luidmila had exclusive control. This shows that what was primarily involved was an apparent tug-of-war over the Nozhnik funds between Vladimir and Luidmila amidst their hostile divorce, rather than a scheme designed and implemented by Defendants.

Once Luidmila obtained exclusive access to the accounts, she alone legally controlled the disposition of the funds. The evidence shows that she then spent over $100,000 from these accounts on "vacations, Life Time Fitness, *several* different department stores including Macy's, TJ Maxx, Kohl's, and *several* checks written to a Michael Vladimir Kostyshyn . . . ." (Pl.'s Ex. A at 8) (emphasis original).[6] Maria did attend a furniture store (Sherwood Studios) shopping trip,[7] and was aware the furniture purchased was for Defendants' home, but this appears to be her only direct involvement with the Nozhnik funds. Several of the shopping sprees at the department stores were for clothing and other consumer goods, benefitting only Luidmila. The actual money spent renovating the home is traceable to checks written to Michael Kostyshyn, the head contractor. These checks were signed by Luidmila and drawn from the Venture Bank account that she had seized from Vladimir. (*See* Pl.'s Ex. AA). Moreover, Kostyshyn testified credibly that Luidmila—not Defendants—hired him for the improvements, paid him directly, and managed his work. (Trial Test. vol. 1, 1:19–24, July 18, 2012). The evidence indicates that Luidmila used these accounts as her personal banking accounts,[8] maintaining complete control

---

[6] (*See* Pl.'s Ex. O-I) ($1,671.72 spent at two Bed Bath & Beyond locations); (*see* Pl.'s Ex. O-Q at 2) ($3,829.12 spent at Apple Vacations); (*see* Pl.'s Ex. O-M at 4) ($3,435.31 spent at 8 Home Depot locations); (*see also* Pl.'s Ex. H) (Venture Bank statements acknowledging these purchases in addition to smaller daily transactions).
[7] While there is some conflicting evidence as to whether Maria attended Luidmila's shopping trip to Sherwood Studios to purchase the furniture, the Court finds this minimally probative of Defendants' control of the money.
[8] (*See* Pl.'s Ex. A at 7) (noting that $3,196.42 was spent "in the ordinary course of living.").

over the disposition of the Nozhnik funds. This again weighs against the theory that Defendants had any involvement in the alleged fraud.

Fourth, it is even more instructive to consider what the money was not used for. To be sure, Defendants did benefit from Luidmila's purchases in some fashion, but the Court does not find that this overcomes the weight of the countervailing evidence. There is no evidence that any funds from Vladimir's accounts were used to pay Defendants' mortgage payments, eliminate any credit card debt, or saved for Luidmila's upcoming educational expenses, or spent on private schooling for their children, new vehicles, or any other luxuries. Additionally, Defendants successfully rebutted Plaintiff's allegation that they used the Nohznik funds for the down payment on the West Bloomfield home purchased in 2009. The $29,000 was written out of Defendants' Wilmington Trust account, which showed a balance well in excess of this amount prior to purchasing the home. (*See* Defs.' Ex. 4 at 3). As Daniil testified, this amount can be traced from profit sharing bonuses deposited into his accounts. *Id.* at 4–5; (Trial Test. vol. 4, 2:16, Oct. 25, 2012, ECF No. 100). Further, the $27,829.10 Everbank check to Luidmila which allegedly funded this purchase was dated September 8, 2009, only three days prior to the down payment. There is no evidence showing that it was deposited into Defendants' bank accounts or otherwise funneled to pay the down payment. (*See* Defs.' Ex. at 1); (*see* Pl.'s Ex. O-HH at 23).

In crucial ways and in sum Plaintiff's case depends on inferences of actual intent to defraud to be drawn primarily and importantly from the facts that Defendants (a) are the daughter and son-in-law of Luidmila and the latter lived with them at the time of the claimed fraudulent actions; (b) they "accepted" Luidmila's gifts or largess of furniture for, and the decoration of, their home and some other expenditures from which they derived a benefit; (c) at least must have arguably had some knowledge of the source and location of the money Luidmila was spending for those items; (d) had some awareness of Luidmila's efforts, and indeed intent, to

keep the money for herself and away from Vladimir and Plaintiff; and (e) looking at the evidence most favorably to Plaintiff, one of them may have shown or indicated to Luidmila how to technically access the accounts holding such funds.[9] Indeed it might satisfy someone's general moral or ethical standards of right and wrong to tar Defendants, or one of them, with the sins of Luidmila and Vladimir under these facts (the latter two being the active ones engaged in schemes and deceptive acts to defraud Plaintiff). However, such standards do not satisfy the requirements of actual fraud under the Bankruptcy Code.

(ii)    <u>Plaintiff's Misplaced Reliance on *In re Perry* and Willful Blindness</u>

Plaintiff contends that Defendants were willfully blind and claims that "[a]ccording to *In re Perry*, the 'turning a blind eye' to fraud, and receiving a benefit from it, is fraud itself." (*See* Pl.'s Reply 6, ECF No. 116) (quoting *In re Perry*, 448 B.R. at 226). Plaintiff overstates the holding in *In re Perry*; willful blindness was only a "factor indicative of fraud" in that case, and it did not establish actual fraud by itself. *Id.* at 227. That court explained that "[w]illful blindness is a form of constructive knowledge that allows one to impute the element of knowledge to a defendant if the evidence indicates that he purposely closed his eyes to avoid knowing what was taking place around him." *In re Perry*, 448 B.R. at 227 n.4. The facts in *In re Perry* supported the conclusion that those debtors actively participated in a fraud, leading the court to reject their defense that they were unaware of the fraudulent scheme. *Id.* at 227. The court explained that this would have constituted willful blindness, which does not provide a defense to those who actively participate in an obvious fraud. *Id.*

Conversely, the present facts do not establish Defendants' active participation with Luidmila's fraud. Willful blindness is the "[d]eliberate avoidance of knowledge of a crime, especially by failing to make a reasonable inquiry about suspected wrongdoing despite being

---

[9] On balance the Court concludes Plaintiff has not borne his burden of proof with regard to this latter claimed fact— but even if he did, in light of all of the other facts it would not be decisive.

aware that it is highly probable." *Black's Law Dictionary* (9th ed. 2009). Thus, for a party to be willfully blind to wrongdoing, this suspected wrongdoing must first be highly probable. *See In re Anton*, 08-64144, 2013 WL 1747907, at *8 (noting that without a "high suspicion" of wrongdoing, a debtor was not willfully blind by failing to inquire into wife's finances).

Perhaps Luidmila's spending was above her apparent means, but the Court is satisfied that Defendants were not aware of a high probability of wrongdoing. Maria testified that she assumed Luidmila had money to pay for the renovations and vacation:

> She had cash on her to make purchases in her life, she had husband, she was working, her husband deposited money in joint accounts. I just assume [sic] that when they separated she probably had money of her own. I had no idea I had to question her where she gets her money from. It's her money why would I question?

(Trial Test. vol. 6, 4:48). The evidence does not suggest that these assumptions were overtly unreasonable. Prior to her accident, Luidmila had worked full time as a home care provider. Although Luidmila didn't control the joint accounts with Vladimir, he provided her money when she needed it. Furthermore, Luidmila spent a majority of the Nohznik funds on smaller consumer goods and daily necessities. These purchases were more frequent, less extravagant, and therefore less likely to raise Defendants' suspicion. The purchases that Defendants were aware of—the furniture, the vacation, and the home improvements—were not so excessive that would suggest that Defendants deliberately ignored an obvious fraud. Considering that Luidmila was a member of the Defendants' household, the Court does not find it suspicious that she would want to contribute money for its improvement. Gratuitous contributions to the household within the family unit normally do not carry with them the assumption of fraud. *See In re Perry*, 448 B.R. at 227 n.3 (Bankr. N.D. Ohio 2011). To the extent that willful blindness can suggest actual fraud, the Court does not find that the present facts give rise to this inference.

Finally, Plaintiff has failed to prove that Defendants committed any coordinated act with Luidmila in furtherance of a scheme to defraud Vladimir. Plaintiff relies heavily on Luidmila's lack of computer skills and her language barriers to support the assumption that Defendants must have helped her steal the Nozhnik funds. But these inabilities were not absolute; the evidence indicates that she could watch online movies and check emails. (Trial Test. vol. 3, 2:09). Vladimir had been teaching her how to use computers and how to set up online bank accounts. (Trial Test. vol. 2, 3:07). She could conduct some banking activity as she shared a joint bank account with Defendants, wrote checks, and used debit cards. Luidmila had been taking English classes and it was evident from trial that she could read and speak some English. (Trial Test. vol. 2, 3:24–27). Luidmila has amply demonstrated that she is highly motivated, cunning, devious, and untrustworthy. She liquidated bank accounts days after the state court presented her the Injunction that explicitly barred this behavior, she hid $5,470 from this Court in her bankruptcy case, and she was able to fly to Russia with $40,000 in cash that has not yet been recovered. *In re Storozhenko*, 487 B.R. at 468. Plaintiff's theory rests upon the negative inference that because Luidmila couldn't have taken the Nozhnik funds alone, Defendants must have assisted her. The Court rejects that conclusion.

*(2) The Weight of the Evidence*

While it is unclear whether Luidmila had help or not appropriating the Nozhnik funds, the evidence does not incriminate Defendants. The fact that they derived some benefit from Luidmila's theft, while probative, does not, in light of all of the recited evidence satisfy Plaintiff's burden of proof. The Court does not find that Defendants were willfully blind to Luidmila's fraud, nor did they control any of the spending. Moreover, the Court also concludes that Defendants did not exhibit any sufficiently intentionally deceptive conduct or a scheme that

meets the requirements of the Code. It is unnecessary to consider the second two elements of the test, and thus Plaintiff's § 523(a)(2)(A) claim is denied.

## C.  The Existence of a Debt

In addition to failing to prove that Defendants' actions constituted a non-dischargeable actual fraud, and while not actually required in light of the Court's indicated conclusion, Plaintiff has failed to prove the existence of any underlying debt. As noted, the existence of this debt was largely presumed by both parties during this case. Plaintiff's complaint contains bare assertions of fraud, fraudulent transfer and conversion. (Pl.'s Compl. ¶¶ 82–86). These claims were ignored during trial to focus on proving actual fraud, but whether "claims of creditors are valid . . . is a question which, in the absence of overruling federal law, is to be determined by reference to state law." *In re Spencer*, 457 B.R. 601, 609 (E.D. Mich. 2011) (quoting *In re Dow Corning Corp.*, 456 F.3d 668, 684 (6th Cir. 2006)). Based on the factual conclusions set forth above, the Court also finds that Plaintiff's alleged bases of liability are meritless.

*(1) Conversion*

Under Michigan law, the tort of conversion is "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *In re Pizzano*, 439 B.R. 445, 450 (Bankr. W.D. Mich. 2010) (quoting *Head v. Phillips Camper Sales and Rental, Inc.*, 593 N.W.2d 595, 604 (Mich. Ct. App. 1999)). To support an action for conversion of money specifically, "defendant must have obtained the money without the owner's consent to the creation of a debtor-creditor relationship and must have had an obligation to return the specific money entrusted to his care." *Lawsuit Fin., L.L.C. v. Curry*, 683 N.W.2d 233, 240 (Mich. Ct. App. 2004) (internal quotations omitted) (citing *Head*, 593 N.W.2d at 603). Plaintiff has failed to prove that Defendants stole Vladimir's money or were ever in wrongful possession of it. While Defendants received gifts or benefits from items purchased by Luidmila using these

funds, they did not take or exert direct domain over Vladimir's money. Consequently, Plaintiff cannot maintain a cause of action against Defendants for conversion.

*(2) Fraudulent Transfer*

Michigan has adopted the Uniform Fraudulent Transfer Act (UFTA) which permits creditors to recover assets that were fraudulently transferred to third parties. Mich. Comp. Laws Ann. § 566.31 (West 2010). Plaintiff alleges that Luidmila transferred "cash, proceeds of bank accounts, personalty, and the down payment and improvements to the Glenshaw Home." (*See* Pl.'s Compl. ¶ 43). However, there was no finding that any cash (including the down payment for the home) was transferred to Defendants, thus barring a fraudulent transfer with respect to those assets. Mich. Comp. Laws Ann. § 566.38(2)(a) (providing recovery against "[t]he first transferee of the asset or *the person for whose benefit the transfer was made*." (emphasis added)). While Defendants did benefit from home improvements and furniture, Plaintiff has the burden to prove that Luidmila transferred the funds used to pay for these goods and services with the intent to hinder, delay, or defraud Vladimir. Mich. Comp. Laws Ann. § 566.34(a).[10] There is evidence showing that Luidmila's act of *taking* Vladimir's money was fraudulent, but Plaintiff did not offer any proof of her intent when she subsequently *transferred* his money. Without proving this requisite scienter, Plaintiff cannot meet his burden to prove a fraudulent transfer.[11]

*(3) Fraud*

Under Michigan law actionable fraud is found if the following elements are met:

(1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any

---

[10] The UFTA also provides grounds for a constructively fraudulent transfer if, among other things, the transfer occurs whiles the debtor is insolvent or it leads to insolvency. Mich. Comp. Laws Ann. § 566.35. Plaintiff has failed to allege any facts supporting this theory and it will not be considered.

[11] There is also authority in Michigan noting that UFTA claims do not apply when the transferor illegally obtained the funds, as is the case here, since he or she would not have legal title to subsequently transfer. *See Alliance Bancorp v. Select Mortgage, L.L.C.*, 274853, 2008 WL 724092 (Mich. Ct. App. Mar. 18, 2008); *See Franklin v. Franklin*, 289255, 2010 WL 2178550 (Mich. Ct. App. June 1, 2010); *but see In re Teleservices Grp., Inc.*, 469 B.R. 713, 763 (Bankr. W.D. Mich. 2012) (declining to follow *Alliance Bancorp's* construction of the UFTA).

knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.

*Titan Ins. Co. v. Hyten*, 817 N.W.2d 562, 567–68 (Mich. 2012). Plaintiff admitted that Defendants did not make any material representation leading to Vladimir's reliance in this case (and the Court has found a lack of intent to defraud). (Pl.'s Resp. to Defs.' Interrog. No. 3, ECF No. 41). Without a material representation, Plaintiff cannot maintain an action for fraud under Michigan law. Therefore, Plaintiff has not met his burden to prove any claim or debt alluded to in his complaint. Plaintiff's proof of claim is therefore disallowed.

### III.     Plaintiff's Objections to Defendants' Proposed Chapter 13 Plan

Although Plaintiff has raised bad faith objections to confirmation of Defendants' proposed chapter 13 plan, the Bankruptcy Code only permits these objections from "part[ies] in interest." 11 U.S.C. § 1134(a). The Bankruptcy Appellate Panel for the Sixth Circuit has interpreted this phrase to mean "one who has an actual pecuniary interest in the case, anyone who has a practical stake in the outcome of a case, and those who will be impacted in any significant way in the case . . . ." *In re Morton*, 298 B.R. 301, 307 (B.A.P. 6th Cir. 2003) (internal citations and quotations omitted) (quoting *In re Cowan*, 235 B.R. 912 (Bankr. W.D. Mo. 1999)).

As a result of the denial of Plaintiff's proof of claim, he is no longer a party in interest, with respect to Defendants' proposed plan. Further, even though this Court will consider the issue of sanctions[12] pertaining to Daniil's improper contact with the translator, any ensuing liability will be addressed outside the scope of this case. The potentially sanctionable conduct occurred well after this case was filed, thus it can only give rise to a claim for a post-petition

---

[12] *See infra* Part IV.

debt.[13] "Debts arising after the petition date . . . are not generally dischargeable in bankruptcy." *In re Spencer*, 457 B.R. 601, 605 (E.D. Mich. 2011) (citing *In re Hester*, 63 B.R. 607, 609 (Bankr. E.D. Tenn. 1986)). Section 1325(a) only provides a discharge for "debts provided for by the plan" and § 1322(a) only permits a chapter 13 plan to include post-petition debts under § 1305, which are "(1) for taxes that become payable to a governmental unit while the case is pending; or (2) a consumer debt, that arises after the date of the order for relief . . . ." 11 U.S.C. §§ 1305(a), 1322(a)(6), 1328(a).

Plaintiff's claim for sanctions against Defendants is neither a tax debt nor a consumer debt, thus it does not fall within the purview of § 1305. Consequently, the claim may not be included in this proposed plan and it will not be discharged by this case. *See In re Spencer*, 457 B.R. at 605; *see In re Trentham*, 145 B.R. 564, 568 (Bankr. E.D. Tenn. 1992). Therefore, the Court concludes that Plaintiff does not have a sufficient pecuniary interest or practical stake to provide standing to object to Defendants' proposed plan. *C.f. In re Woodall*, 81 B.R. 17 (Bankr. E.D. Ark. 1987) (rejecting debtor's argument that the IRS holding a post-petition tax claim didn't have standing to object in a chapter 13 case because the debt was allowable under § 1305(a)(1) and could be included in that bankruptcy case)). Plaintiff's objections to confirmation of Defendants' proposed chapter 13 plan under § 1325(a) are therefore denied.

## IV.     Disgorgement of Attorney's Fees of Bordoley

### A.  Plaintiff's Standing to Allege Violations of §§ 526–528

Plaintiff brought a Motion to Disgorge the Attorney's Fees of Martin Bordoley pursuant to § 329(b)(1)(A) and argued at the evidentiary hearing that Bordoley failed to comply with the requirements of 11 U.S.C. §§ 526–528 ("the debt relief requirements"). At the hearing, Bordoley

---

[13] This Court has supported the "fair contemplation" test for determining whether or not a debt arose pre or post-petition. *In re Spencer*, 457 B.R. 601 (E.D. Mich. 2011). However, no analysis of this test is required as the entire claim for sanctions clearly arose out of post-petition conduct.

did not deny violating the debt relief requirements, but instead contended that Plaintiff does not have proper standing to bring this motion. (Hr'g on Mot. to Disgorge, 9:42, July 16, 2012, ECF No. 234).

Bankruptcy courts are authorized to disgorge any fees to the extent they are excessive. *See* 11 U.S.C. § 329(b); *see also* Fed. R. Bankr. P. 2017(a). Moreover, bankruptcy courts are mandated to impose stringent penalties against a "debt relief agency" if it fails to comply with the debt relief requirements. *See* 11 U.S.C. §§ 526–528. As an attorney providing bankruptcy relief, Bordoley qualifies as a "debt relief agency" and must comply with the debt relief requirements. *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 239 (2010). A debt relief agency that fails to comply with these requirements is liable to the "assisted person," which in this case indisputably refers to Defendants. Nevertheless, Bordoley conceded at the hearing that the Court has the authority and the obligation to oversee the fees awarded in this case, including considering issues of §§ 526–528 *sua sponte*. *See In re Humphries*, 453 B.R. 261, 267 (E.D. Mich. 2011) ("the bankruptcy court always retains the authority to sua sponte[ ] tak[e] any action or make[ ] any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." (brackets original) (quoting 11 U.S.C. § 105(a))). Since the evidentiary hearing on this issue revealed serious violations of the debt relief requirements, the Court will consider this issue *sua sponte* and reject Bordoley's standing defense.

**B. Bordoley's Violations of the Debt Relief Requirements**

As a qualifying debt relief agency, Bordoley was required to:

[G]ive written notice of various forms of bankruptcy relief under Title 11 and the availability of credit counseling services [§ 527(a)(1)], . . . furnish additional written notice of the debtor's obligation to provide truthful, accurate, and thorough information to the bankruptcy court regarding all assets, income, and liabilities [§ 527(a)(2)]; . . . provide yet additional notice concerning the lawyer's obligation and the debtor's rights as to creditors and self-representation [§ 527(b)], . . .

> maintain a copy of the written notices furnished to the debtor [§ 527(d)]; . . . make certain specific disclosures in any advertisement for debt relief services [§ 528(a)(3), (4) & (b)(2)]; . . . and execute a written contract for legal services within five business days after first furnishing any bankruptcy assistance [§ 528(a)(1)] . . . .

*In re Humphries*, 453 B.R. at 263 (quoting 11 U.S.C. §§ 526–528). Bordoley admitted that he did not provide Defendants with the mandatory written disclosures under § 527. (Hr'g on Mot. to Disgorge, 9:42). Consequently, Bordoley could not comply with section (d), which requires the attorney to keep written copies of these disclosures for two years. *Id.* at (d). Further, Bordoley did not execute any written retainer agreement with the necessary disclosures, violating § 528(a) in its entirety. *Id.* at 9:43–44. Overall, Bordoley failed to comply with *any* of the applicable debt relief requirements. *See* 11 U.S.C. §§ 527(a)(1), (a)(2), (b), 528(a).

"Sections 526, 527, and 528 are the three sections added by BAPCPA aimed at curbing abusive practices undertaken by attorneys as well as other bankruptcy professionals." *In re Humphries*, 453 B.R. 261, 268 (E.D. Mich. 2011) (quoting *Milavetz*, 559 U.S. 229, 236 n.3 (2010)). Depending on the type of violation, either one of two mandatory remedies will apply—the contract between the debtor and the attorney shall be voided under § 526(c)(1), or the court shall assess actual damages, attorneys' fees, and costs under § 526(c)(2). 11 U.S.C. § 526(c). Whether or not the violation falls under (c)(1) or (c)(2) applies is a subtle distinction that was recently addressed in this district. *See In re Humphries*, 453 B.R. 261, 269 (E.D. Mich. 2011); *see In re Galloway*, 11-CV-10380, 2011 WL 2148603 (E.D. Mich. May 30, 2011).

Distinguishing between the two remedies, the court in *In re Humphries* explained that "[s]ubsection 526(c)(1) deals with 'contract[s] for bankruptcy assistance,' and says that if such a contract does not measure up, it is void and cannot be enforced against the debtor." *In re Humphries*, 453 B.R. at 268 (quoting 11 U.S.C. § 526(c)(1)). Thus, (c)(1) is triggered when the contract terms are materially deficient—for example, they omit required language, the

27

disclosures are not conspicuous or clearly written, or the services to be provided are not adequately defined. *See* § 528(a) (describing the required elements of a debt relief contract).

On the other hand, "[s]ubsection 526(c)(2) deals with the conduct of debt relief agencies (including law firms) themselves, and it sets forth a list of remedies that may be directed against them if they intentionally or negligently fail[ ] to comply with any provision of these three sections, [§ 526(c)(2)(A–C)] . . . ." *Id.* (brackets original) (quoting 11 U.S.C. § 526(c)(2)). *Id.* Based on this reasoning, the *In re Humphries* court concluded that a firm's failure to execute an agreement with the debtor within the five days required by § 528(a)(1) constituted a conduct violation warranting the (c)(2) remedy. *In re Humphries*, 453 B.R. at 268; *see also In re Galloway*, 2011 WL 2148603 at *5 (also applying (c)(2) to a similar violation).

Extending the logic of *In re Humphries* to the instant matter, the Court finds that the failure to execute any written fee agreement was a failure by Bordoley to conform to the *conduct* required of a qualified debt relief agency under (c)(2). Otherwise, it would be illogical for the Court to determine whether or not the terms of a non-existent contract materially comply with the requirements of §§ 526–528. *See* 11 U.S.C. § 526(c)(1). Moreover, the remedy for a (c)(1) violation is voiding the deficient contract, which obviously presupposes the existence of a contract in the first place. *Id.* at (c)(1). Thus, when an attorney fails to execute any written contract, (c)(2) provides the more logical remedy. *Id.*

## C. The Remedy for Bordoley's Violations of the Debt Relief Requirements

Bordoley's failure to provide the requisite § 527 disclosures and failure to execute any contract are both (c)(2) violations. Bordoley has had a lengthy legal career which has included bankruptcy practice and there is no excuse for such extensive violations of the debt relief requirements. At hearing, he could not offer any defense for his inactions. (Hr'g on Mot. to Disgorge, 10:11). Therefore, the Court finds that Bordoley negligently failed to comply with all

applicable sections of the debt relief requirements under § 526(c)(2)(A) and he shall be liable to Defendants for "the amount of any fees or charges in connection with providing bankruptcy assistance to such person that such debt relief agency has received, for actual damages, and for reasonable attorneys' fees and costs . . . ." 11 U.S.C. § 526(c)(2).

Plaintiff asserts that this provision also allows him to recover his attorney's fees for the cost of bringing this motion. However, the Court's understanding of the statute is that if the violation is found the "debt relief agency shall be liable *to an assisted person*." *Id.* (emphasis added). The Defendants were the assisted persons in this case and all remedies within (c)(2)—the amount paid for debt relief services, any actual damages, attorney's fees, and costs—relate back to the agency between the assistor and the assisted person. *Id.* Plaintiff is a third party, and despite incurring costs to bring this motion, the statute does not provide him any recourse. Defendants did not contest Bordoley's fees and thus there is no evidence on the record indicating actual damages, attorneys' fees, or costs. Nevertheless, the language in the statute is mandatory and Bordoley is ordered to disgorge the $2,000 in fees he received from Defendants in connection with the offending debt relief service he provided to them.

## V.    The Imposition of Sanctions Relating to Daniil's Improper Communication with the Translator

On the morning of the second day of trial, Plaintiff brought to the Court's attention an email sent by Daniil to the translator Olena Denysenko the night before. The purpose of this message was to suggest "correct" translations for several Russian terms used during Luidmila's testimony. (*See* Pl.'s Ex. ZZ). The email contained 12 Russian terms Denysenko had used in her translation of Luidmila's testimony accompanied with Daniil's recommendations for what he believed were the more appropriate translations. *Id.* After taking testimony from the interpreter and arguments by the parties' attorneys, the Court held:

Number 1, the approach itself is the problem in this case and the communication with the translator in referencing the substance of the translation is the problem in this case—totally out of line, improper, never should have occurred, and it better not occur again—number 1. Number 2, the remedy in this case is I'm disqualifying all testimony of the witness for which this translator acted, period. End of story.

(Sanctions Hr'g, 11:07–08, Oct. 4, 2012). Plaintiff orally moved for sanctions due to the increased litigation costs he would bear, but the Court declined to consider sanctions at that time:

I don't want to have to consider this testimony or decide what the effect of this approach was or wasn't. I realize this now puts a burden on you because this was your witness and you called this witness—correct? . . . . And presumably in light of what I just said you will want to recall this witness with another translator. And that means there will be sanctions in this case. I'm not going to decide what they are now, but they will be substantial . . . .

*Id.* at 11:08–09. At that time no judgment or order for sanctions was entered against Defendants.

The following day of trial, the Court revisited the issue to formalize the procedure going forward. The Court instructed Plaintiff to file a motion detailing the sanctions he is seeking, provided Defendants ten days to respond, and stated that a hearing would be set once the issues at trial were resolved. (Trial Test. vol. 2, 2:16–17). The Court explained that it "will definitely make a decision at a time that I think . . . will allay or not allay the concerns of [Plaintiff's counsel], as expressed. We need a more . . . formal procedure than was initially suggested." *Id.* at 2:18. Plaintiff filed a Motion for Sanctions, to which Defendants filed a timely reply, and the matter is currently held in abeyance until the trial issues are resolved. (Pl.'s Mot. for J., Oct. 16, 2012, ECF No. 90). Nevertheless, on November 7, 2012, Defendants filed an Ex-Parte Motion for Reconsideration of Sanctions and a Motion for Sanctions against David Findling. (Defs.' Mot. to Reconsider, Nov. 7, 2012, ECF No. 104); (Defs.' Mot. for Sanctions, Nov. 20, 2012, ECF No. 105). Plaintiff claimed that this motion was frivolous and countered with another Motion for Sanctions, this time against Defendants' counsel pursuant to F.R.C.P. 11(b)(1) and (3). (Pl.'s Resp. and Mot. for Sanctions, Dec. 4, 2012, ECF No. 107).

## A. Defendants' Motion to Reconsider

This Court has not yet imposed sanctions on Defendants. Thus, Plaintiff's Motion to Reconsider is premature and the Court will not consider its substantive arguments. Local Bankruptcy Rule 9024-1 governs motions to reconsider and indicates that an issue must first be ruled upon by the Court before it can be reconsidered:

> **(3) Grounds.** Generally, and without restricting the discretion of the court, a motion for reconsideration that merely presents the same issues *ruled upon* by the court, either expressly or by reasonable implication, will not be granted. The movant shall not only demonstrate a palpable defect by which the court and the parties have been misled but also show a *different disposition* of the case must result from a correction thereof.

E.D.Mich. LBR 9024-1(a)(3) (emphasis added). Furthermore, "[t]he deadline to file a motion for reconsideration of an *order or judgment* . . . is 14 days *after the entry of the order or judgment.*" *Id.* at (a)(1) (emphasis added). If the Court has not yet ruled on an issue, a motion to reconsider that issue is clearly premature. *See In re Genmar Holdings, Inc.*, 490 B.R. 833, 836 (B.A.P. 8th Cir. 2013) (holding that a motion to reconsider the disallowance of a claim was premature as the court had not yet ruled on that issue). To clarify the Court's earlier statements,[14] this matter will be set for hearing which will allow Defendants to contest both the propriety and nature of sanctions. Defendants' Motion for Reconsideration is denied.

## B. Defendants' Motion for Sanctions Against Plaintiff

Pursuant to Bankruptcy Rule 9011, Defendants move this Court to impose sanctions against Plaintiff's counsel for "making false representations and factual contentions to the court during trial which lack evidentiary support and for asserting claims and other legal contentions which are not supported by existing law." (Def.'s Mot. for Sanctions ¶¶ 1–3, ECF No. 105). Rule 9011(b)(3) provides:

---

[14] It was apparently assumed by both parties that sanctions were already entered. (*See* Pl.'s Mot. for J. ¶ 1, ECF No. 90); (Defs.' Mot. to Reconsider, ECF No. 104).

By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

\*   \*   \*

(3) the allegations and other factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Fed. R. Bankr. P. 9011(b)(3) (2012). The core of Defendants' motion alleges that Plaintiff's counsel made a "spurious claim to the court without any foundation alleging that Mr. Rapoport improperly contacted the translator, Olena Denysenko . . . as a result of his communication with her via email." (Defs.' Mot. for Sanctions ¶ 2). Thus, Defendants contend that Plaintiff's counsel made a misrepresentation to the Court when he alleged that Daniil contacted the translator for an *improper purpose*. This argument must fail for several reasons.

First, the alleged misrepresentation by Plaintiff's counsel was not a "petition, written motion, or other paper" filed with this Court. Fed. R. Bankr. P. 9011(b)(3). A statement in open court does not fall within the clear language of 9011(b)(3). *Id.* Thus, this Motion lacks any legal basis. Second, Plaintiff's counsel's allegation was not only reasonable based on the present information, but it was irrelevant to the Court's ruling. Daniil's email speaks for itself; it indisputably shows some attempt to influence or change the translator's testimony. (*See* Pl.'s Ex. ZZ). The Court found that the communication itself was improper regardless of Daniil's intent as it overtly discussed the interpreter's future testimony. (*See* Sanctions Hr'g, 11:07–09). Defendants' Motion for Sanctions has no legal or factual basis and it is therefore denied.

Furthermore, the Court must question Defendants' counsel's sincerity in filing this motion as it appears he used it as another means to protest his disagreement with the decision to strike Luidmila's testimony. The motion states that "[Daniil] is in the best position to address these issues with the Translator" and "[t]here was absolutely no need to notify the court of

Receiver as there was no violation of any court rule or order." (Defs.' Mot. for Sanctions ¶¶ 11, 12). Counsel even attached a third-party interpretation of the testimony to prove that Daniil's suggestions were indeed more accurate than Olena's actual translation. *Id.* at 19–22. By filing this motion and making these claims, Defendants' counsel has not shown any deference to the Court's decision. Defendants' concerns with the translator should have been addressed through the proper channels, rather than with an ex-parte communication. Given the apparently questionable motives behind Defendants' counsel filing this motion, Plaintiff's Motion for Sanctions [ECF No. 107] will proceed to a hearing, after Defendants' counsel has the opportunity to respond thereto.

CONCLUSIONS

For the foregoing reasons, the Court holds that: (1) Plaintiff has not met his burden to establish the existence of any underlying debt, or a debt that would be non-dischargeable under § 523(a)(2)(A); (2) Plaintiff's proof of claim is **DISALLOWED**; (3) Plaintiff's Objections to Defendants' Proposed Plan are **OVERRULED**; (4) Attorney Martin Bordoley is **ORDERED** to disgorge his $2,000 attorney fee from this case to Defendants; (5) Defendants' Motion for Reconsideration and Sanctions are **DENIED;** and (6) Defendants' counsel will have an opportunity to respond to Plaintiff's Rule 11 Motion for Sanctions [ECF No. 107] against him, and an evidentiary hearing will be scheduled to hear this matter as well as Plaintiff's Motion for Sanctions [ECF No. 90] against Defendants for their improper contact with the translator during trial. An order will be contemporaneously entered in accordance with this opinion.

.

Signed on January 14, 2014

```
_____ __/s/ Walter Shapero_      ___
      Walter Shapero
      United States Bankruptcy Judge
```